UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLUGBENGA AKINNAGBE; GREGORY ALLEN; LUIS BARRIOS; RANDY CREDICO; DESIREE DELOACH; EDWARD DIAZ; TYRONE DICKERSON; CARL DIX; CHRISTINA GONZALEZ; NICHOLAS MALINOWSKY; SAMANTHA MCINTIRE; JASON MCGAUGHEY; MARGARET RATNER KUNSTLER; ROBERT PARSONS; MORGAN RHODEWALT; PHILIP STRICKLAND; and MATTHEW SWAYE, | **COMPLAINT AND DEMAND FOR JURY TRIAL**  <br><br> **14 CV 6147** |

Plaintiffs,

-v-

THE CITY OF NEW YORK; NYPD Captain WILLIAM GARDNER; NYPD OFFICERS MARCO ALZATE (Shield No. 16914); ANTHONY ANGLISANSO; TONY ANTIRA (Shield No. 6448); JOHN BLANCO (Shield No. 3627); JOSEPH CHON (Shield No. 12320); YUBELCA FERNANDEZ; LARRY MEYERS (Shield No. 29486); ANDREW SHON (Shield No. 22842); DENISE VEGA (Shield No. 22584); and POLICE OFFICERS JOHN/JANE DOES Nos. 1-20 in their individual capacities,

Defendants.

Plaintiffs, by their attorneys REBECCA HEINEGG and SARAH KUNSTLER, as and for their complaint, allege as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought pursuant to the United States Constitution and 42 U.S.C. § 1983, seeking redress for defendants' spurious arrest of peaceful protesters. Defendants, members of the New York City Police Department ("NYPD"), inexcusably abused their power and authority, thus depriving plaintiffs of the rights, privileges, and immunities secured by the Constitution and laws of the United States.

1

2.      On November 1, 2011, defendants wrongfully, maliciously and without probable cause, arrested approximately 28 people, including the 17 plaintiffs in this case, whose only "crime" was exercising their constitutionally protected right to engage in peaceful protest against the NYPD's "Stop & Frisk" practices.

3.      By itself, defendants' arrest and prosecution of plaintiffs without any basis whatsoever, much less the probable cause required by law, is unacceptable. When paired, however, with defendants' obvious distaste for plaintiffs' political message, their attempt to squelch plaintiff's speech and discourage future dissent is reprehensible.

4.      Plaintiffs seek a judgment: (i) declaring that the defendants violated their constitutional rights by subjecting them to utterly baseless arrests, unnecessarily prolonged detentions and unwarranted prosecutions; (ii) awarding compensatory damages for the injuries caused by defendants' unlawful conduct; and (iii) awarding punitive damages assessed against the individual defendants to deter future intentional, and/or reckless deviations from well-settled constitutional law.

## JURISDICTION AND VENUE

5.      This action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

6.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

7.      The acts complained of occurred in the Eastern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. §1391(b).

## JURY DEMAND

8.      Plaintiffs demand trial by jury in this action.

## PARTIES

9.     Plaintiff OLUGBENGA AKINNAGBE is 35 years old, and at all times relevant to this action was a resident of Kings County, New York. He is a professional actor.

10.    Plaintiff GREGORY ALLEN is 41 years old and all times relevant to this action was a resident of New York County, New York. He works for a printing company.

11.    Plaintiff Father LUIS BARRIOS is 62 years old, and at all times relevant to this action was a resident of Queens County. He is an Episcopal Priest and a professor of psychology and ethnic studies at John Jay College of Criminal Justice, City University of New York.

12.    Plaintiff RANDY CREDICO is 60 years old, and at all times relevant to this action was a resident of New York County, New York. He is a political satirist and lobbyist.

13.    Plaintiff DESIREE DELOACH is 30 years old, and at all times relevant to this action was a resident of New York County, New York. She is employed as a dog walker.

14.    Plaintiff EDWARD DIAZ is 26 years old, and at all times relevant to this action was a resident of New York County, New York. He is employed as a barista.

15.    Plaintiff TYRONE DICKERSON is 26 years old, and at all times relevant to this action was a resident of Bronx County, New York. He is employed in marketing and sales.

16.    Plaintiff CARL DIX is 65 years old, and at all times relevant to this action was a resident of New York County, New York. He is retired.

17.    Plaintiff CHRISTINA GONZALEZ is 27 years old, and at all times relevant to this action was a resident of New York County, New York.

18.    Plaintiff NICHOLAS MALINOWSKI is 32 years old, and at all times relevant to this action was a resident of Kings County, New York. He is employed as a social worker with Brooklyn Defender Services.

19.    Plaintiff SAMANTHA MCINTIRE is 33 years old, and at all times relevant to this action was a resident of New York County, New York. At the time of her arrest, her legal name was Timothy Barker.

20.    Plaintiff JASON MCGAUGHEY is 29 years old, and at all times relevant to this complaint was a resident of New York County, New York. He is employed as a direct support professional.

21.    Plaintiff MARGARET RATNER KUNSTLER is 69 years old, and at all times relevant to this action was a resident of Kings County, New York. She is an attorney.

22.    Plaintiff ROBERT PARSONS is 68 years old, and at all times relevant to this action was a resident of New York County, New York. He is a retired auto worker.

23.    Plaintiff MORGAN RHODEWALT is 31 years old, and at all times relevant to this action was a resident of Hampshire County, Massachusetts. He is employed as an educational farm manager.

24.    Plaintiff PHILIP STRICKLAND is 26 years old, and at all times relevant to this action was a resident of New York County, New York.

25.    Plaintiff MATTHEW SWAYE is 37 years old, and at all times relevant to this action was a resident of New York County, New York.

26.    Defendant City of New York ("City") is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, defendant City, acting through the New York City Police Department ("NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel, including the defendants referenced herein. In addition, at all relevant times, defendant City was responsible

for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States.

27.    At all times relevant hereto, defendant William Gardner was a Captain in the NYPD and the Commanding Officer and or/Borough Commander of the Brooklyn North Task Force ("BNTF"), acting in his official capacity as an employee, agent, and servant of the City, and within the scope of his employment, and was also a City policy-maker with respect to NYPD matters.

28.    At all times relevant hereto, defendants Marco Alzate, (Shield No. 16914), Anthony Anglisano, Tony Antira (Shield No. 6448), John Blanco (Shield No. 3627), Joseph Chon (Shield No. 12320), Yubelca Fernandez, Larry Meyers (Shield No. 29486); Andrew Shon (Shield No. 22842), and Denise Vega were police officers of the NYPD, acting in the capacity of agents, servants, and employees of defendant City, and within the scope of their employment as such.

29.    At all times relevant hereto, defendants John /Janes Doe Nos. 1-20 (the "Doe defendants") whose names plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe" and "Jane Doe," were police officers of the NYPD, acting in the capacity of agents, servants, and employees of defendant City, and within the scope of their employment as such.

30.    All defendants except the City of New York, including the Doe defendants, will be referred to collectively as the "individual defendants."

31.    The individual defendants are being sued in their individual capacities.

## STATEMENT OF FACTS

32.    The incident alleged herein occurred at approximately 5:00 p.m. on November 1, 2011 in the vicinity of 1470 East New York Avenue in Kings County, and continued thereafter as set forth below.

33.    On the afternoon of November 1, 2011, a group of demonstrators, including the plaintiffs in this action, gathered at The Tilden Houses, a housing project on the corner of Livonia and Rockaway Avenues and, accompanied by Community Affairs Officers from the NYPD, marched to the 73rd Precinct at 1470 East New York Avenue in Brownsville, Brooklyn to protest the NYPD's "Stop, Question and Frisk" policy.

34.    The New York Times has called Brownsville "ground zero in the New York Police Department's controversial crime fighting strategy known as stop, question and frisk." A 2010 New York Times report found that the highest concentration of police stops occurred in Brownsville. On information and belief, between January 2006 and March 2010, the police made nearly 52,000 stops in the neighborhood. And in January of 2014, when Mayor Bill de Blasio announced that the City would settle its long-running legal battle over the NYPD's use of Stop, Question and Frisk, he chose Brownsville as the backdrop for this announcement.

35.    The November 1st action was openly planned and promoted. Thus, not surprisingly, protesters were met by a large police presence when they arrived for a rally at the Tilden Houses, where a number of protesters voiced their opposition to the NYPD's stop and frisk practices.

36.    After the rally, the plaintiffs and others proceeded to the NYPD's 73rd Precinct, where they lawfully gathered on the sidewalk in front of the building to protest the NYPD's stop and frisk practices.

37.   The protesters chanted slogans including "cease and desist, stop stop and frisk," "we won't stop until we stop stop and frisk," "the whole world is watching," "who are you protecting," and "we say no to the new Jim Crow." Many protesters carried signs. Among the messages, some of the signs read "Stop Stop & Frisk," "Stop NYPD Stop & Frisk," "Would You Stop & Frisk Me If I Were Black or Latina?" and "Expect Resistance Until They Respect Our Existence."

38.   At no time did plaintiffs block the entrance to the 73rd Precinct.

39.   After approximately ten minutes, defendant GARDNER ordered the unlawful arrest of plaintiffs, and a number of the individual defendants, including but not limited to ALZATE, ANGLISANSO, ANTIRA, BLANCO, CHON, FERNANDEZ, MEYERS, SHON, VEGA, and a number of the JOHN/JANE DOE defendants, effected those arrests.

40.   Other JOHN/JANE DOE defendants failed to intervene to prevent these unlawful arrests.

41.   That day, without reason, probable cause, or any basis whatsoever, defendants falsely, intentionally, and maliciously charged each plaintiff with disorderly conduct (a violation of Penal Law 240.20(6) and obstructing governmental administration (a violation of Penal Law 195.05).

42.   Defendants had absolutely no basis to believe that plaintiffs had committed disorderly conduct or obstruction of governmental administration at any time on November 1, 2011.

43.   On information and belief, defendants' only reason for arresting, imprisoning and prosecuting plaintiffs was to retaliate against them for their involvement in the rally and protest in front of the 73rd Precinct and to prevent that protest from going forward.

44.     Notwithstanding their obvious lack of probable cause, defendants chose to pursue and prosecute these baseless charges against plaintiffs.

45.     Plaintiffs were thus forced to retain counsel and make court appearances to defend themselves against the trumped up charges.

46.     Defendants handcuffed plaintiffs and transported them to the 75th Precinct at 1000 Sutter Avenue in Kings County, New York.

47.     Plaintiff OLUGBENGA AKINNAGBE was held in custody for approximately 6 to 10 hours and then released with a Desk Appearance Ticket.

48.     Mr. AKINNAGBE was forced to return to court approximately 11 times to defend himself against the criminal proceedings initiated against him by defendants, including two days of trial.

49.     On February 28, 2013, the charges against Mr. AKINNAGBE were dismissed based on the prosecution's failure to make out a prima facie case.

50.     Plaintiff GREGORY ALLEN was released approximately 8 to 10 hours later with a Desk Appearance Ticket.

51.     Mr. ALLEN was forced to return to court approximately 9 times to defend himself against the criminal proceedings initiated against him by defendants, including two days of trial.

52.     On December 11, 2012, the charges against Mr. ALLEN were dismissed based on the prosecution's failure to make out a prima facie case.

53.     Plaintiff Father LUIS BARRIOS was held in custody for approximately 6 hours and released with a Desk Appearance Ticket.

8

54.    Father BARRIOS was forced to return to court approximately 11 times to defend himself against the criminal proceedings initiated against him by defendants, including two days of trial.

55.    On February 28, 2013, the charges against Father BARRIOS were dismissed based on the prosecution's failure to make out a prima facie case.

56.    Plaintiff RANDY CREDICO was held for approximately 8 to 10 hours and then released with a Desk Appearance Ticket.

57.    Mr. CREDICO was forced to return to court approximately 20 times to defend himself against the criminal proceedings initiated against him by defendants.

58.    On May 23, 2013, the charges against Mr. CREDICO were dismissed.

59.    Plaintiff DESIREE DELOACH was held for approximately 8 to 10 hours and released with a Desk Appearance Ticket.

60.    Ms. DELOACH was forced to return to court approximately 3 to 5 times to defend herself against the criminal proceedings initiated against her by defendants. Her case was adjourned in contemplation of dismissal.

61.    Plaintiff EDWARD DIAZ was held for approximately 6 to 10 hours and released with a Desk Appearance Ticket.

62.    Mr. DIAZ was forced to return to court approximately 20 times to defend himself against the criminal proceedings initiated against him by defendants. On May 23, 2013, the charges against Mr. DIAZ were dismissed.

63.    Plaintiff TYRONE DICKERSON was held for approximately 72 hours and was released after arraignment from Brooklyn Criminal Court.

64.   Plaintiff DICKERSON accepted an adjournment in contemplation of dismissal after two trips to court.

65.   Plaintiff CARL DIX was held for approximately 10 hours and released with a Desk Appearance Ticket.

66.   Mr. DIX was forced to return to court approximately 11 times to defend himself against the criminal proceedings initiated against him by defendants, including two days of trial.

67.   On February 28, 2013, the charges against Mr. DIX were dismissed based on the prosecution's failure to make out a prima facie case.

68.   Plaintiff CHRISTINA GONZALEZ was handcuffed excessively tightly by defendants. When she asked defendants to loosen the handcuffs, she was ignored. Her hands were swollen and in pain for the rest of the day. At one point she started to lose feeling in both arms.

69.   Ms. GONZALEZ was held for over 24 hours and was released the following evening after arraignment from Brooklyn Criminal Court.

70.   Ms. GONZALEZ was forced to return to court approximately 20 times to defend herself against the criminal proceedings initiated against her by defendants.

71.   On May 23, 2013, the charges against Ms. GONZALEZ were dismissed.

72.   Plaintiff NICHOLAS MALINOWSKI was held for approximately 8 hours and released with a Desk Appearance Ticket.

73.   Mr. MALINOWSKI was forced to return to court approximately 20 times to defend himself against the criminal proceedings initiated against him by defendants.

74.   On May 23, 2013, the charges against Mr. MALINOWSKI were dismissed.

75.     Plaintiff SAMANTHA MCINTIRE was held for approximately 8 hours and released with a Desk Appearance Ticket.

76.     Ms. MCINTIRE was forced to return to court approximately 2 to 3 times to defend herself against the criminal proceedings initiated against her by defendants.

77.     Ms. MCINTIRE's case was adjourned in contemplation of dismissal.

78.     Plaintiff JASON MCGAUGHEY was held for approximately 8 hours and released with a Desk Appearance Ticket.

79.     Mr. MCGAUGHEY was forced to return to court approximately 10 times to defend himself against the criminal proceedings initiated against him by defendants.

80.     Mr. MCGAUGHEY's case was adjourned in contemplation of dismissal.

81.     Plaintiff MARGARET RATNER KUNSTLER was held in custody for approximately 6 to 10 hours and then released with a Desk Appearance Ticket.

82.     Ms. RATNER KUNSTLER's case was adjourned in contemplation of dismissal.

83.     Plaintiff ROBERT PARSONS was held in custody for approximately 6 to 10 hours and then released with a Desk Appearance Ticket.

84.     Mr. PARSONS was forced to return to court approximately 20 times to defend himself against the criminal proceedings initiated against him by defendants.

85.     On May 23, 2013, the charges against Mr. PARSONS were dismissed.

86.     Plaintiff MORGAN RHODEWALT was held in custody for approximately 6 to 10 hours and then released with a Desk Appearance Ticket.

87.     Mr. RHODEWALT was forced to return to court approximately 11 times to defend himself against the criminal proceedings initiated against him by defendants, including two days of trial.

88.     On February 28, 2013, the charges against Mr. RHODEWALT were dismissed based on the prosecution's failure to make out a prima facie case.

89.     Plaintiff PHILIP STRICKLAND was held in custody for approximately 8 to 9 hours and then released with a Desk Appearance Ticket.

90.     Mr. STRICKLAND's case was adjourned in contemplation of dismissal.

91.     Plaintiff MATTHEW SWAYE was held in custody for approximately 6 to 10 hours and then released with a Desk Appearance Ticket.

92.     Mr. SWAYE was forced to return to court approximately 25 times to defend himself against the criminal proceedings initiated against him by defendants.

93.     On October 17, 2013 the charges against Mr. SWAYE were dismissed.

94.     As a direct and proximate cause of their unlawful arrest, assault, confinement, and prosecution, plaintiffs have suffered physical pain, injury to their reputations, humiliation, psychological pain, suffering, and mental anguish, lost wages, and were otherwise damaged and injured.

## FIRST CAUSE OF ACTION
### DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

95.     Plaintiffs repeat and re-allege the foregoing paragraphs as if the same were fully set forth at length herein.

96.     Defendants GARDNER, ALZATE, ANGLISANSO, ANTIRA, BLANCO, CHON, FERNANDEZ, MEYERS, SHON, VEGA, and a number of the JOHN/JANE DOE defendants, under color of state law, unlawfully seized and arrested plaintiffs OLUGBENGA AKINNAGBE, GREGORY ALLEN, LUIS BARRIOS, RANDY CREDICO, DESIREE DELOACH, EDWARD DIAZ, TYRONE DICKERSON, CARL DIX, CHRISTINA

GONZALEZ, NICHOLAS MALINOWSKY, SAMANTHA MCINTIRE, JASON
MCGAUGHEY, MARGARET RATNER KUNSTLER, ROBERT PARSONS, MORGAN
RHODEWALT, PHILIP STRICKLAND, and MATTHEW SWAYE.

97.   Defendants did not have probable cause to arrest plaintiffs, nor was it objectively
reasonable for defendants to believe that they did have probable cause to arrest plaintiffs.

98.   Defendants' decision to arrest plaintiffs was not based upon plaintiffs' violation
of any provision of the penal law.

99.   By arresting and imprisoning plaintiffs without probable case, assaulting them,
searching them, depriving them of their right to speech and peaceful assembly on a public street,
and retaliating against them because they participated in a protest against NYPD practices,
defendants deprived plaintiffs (or failed to prevent the deprivation of) rights, remedies,
privileges, and immunities guaranteed to every citizen of the United States, in violation of rights
enforceable under 42 U.S.C. § 1983, including, without limitation, rights guaranteed by the First,
Fourth and Fourteenth Amendments of the United States Constitution.

100.  In addition, defendants conspired among themselves to deprive plaintiffs of their
constitutional rights secured by 42 U.S.C. § 1983, and by the First, Fourth, and Fourteenth
Amendments to the United States Constitution, and took numerous overt steps in furtherance of
such conspiracy, as set forth above.

101.  Defendants acted under pretense and color of state law in their individual and
official capacities and within the scope of their respective employment as NYPD officers.
Notwithstanding that, defendant's acts were beyond the scope of their jurisdiction, without
authority of law, and in abuse of their powers.

13

102. Defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights as secured by 42 U.S.C. § 1983, and by the First, Fourth, and Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION
### MALICIOUS PROSECUTION– 42 U.S.C. § 1983

103. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

104. By the actions described above, by the false allegations against plaintiffs AKINNAGBE, ALLEN, BARRIOS, CREDICO, DIAZ, DIX, GONZALEZ, MALINOWSKI, PARSONS, RHODEWALT, and SWAYE in the accusatory instrument, the individual defendants, acting willfully and maliciously, caused a criminal proceeding to be initiated against plaintiffs, even though there was no probable cause for an arrest or prosecution in this matter.

105. The individual defendants maliciously caused this prosecution to be initiated in that they knew there was no probable cause for such prosecution and that they further wished to harm and punish plaintiff for illegitimate reasons.

106. The criminal cases against plaintiffs were terminated in their favor in that all charges were dismissed in their entirety.

107. As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and were otherwise damaged and injured.

## THIRD CAUSE OF ACTION
### *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

108. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

14

109.  All of the acts and omissions by the individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

110.  Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

111.  The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

112.  The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a.  Unlawful detention and/or harassment of civilians engaged in activity protected by the First Amendment;

b.  Arresting persons known to be innocent in order to meet "productivity goals" (*i.e.*, arrest quotas), particularly where such persons are engaged in activity protected by the First Amendment and/or the consent decree in *Black v. Codd*;

c.  Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony,

  i. in order to chill or obstruct persons from engaging in activity protected by the First Amendment;

  ii. in order to protect themselves or other officers; and/or

  iii. in order to meet said productivity goals; and/or

d. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

e. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

f. Retaliating against officers who report police misconduct; and

g. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

113.  The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the use of excessive force, unlawful detention, interference with protected First Amendment activity, retaliatory use of force, abuse of process and deprivation of liberty without due process of law against individuals engaged in protected First Amendment activity, may be inferred from repeated occurrences of similar wrongful conduct, as documented by journalists, video, and in civil rights actions filed against the CITY:

a. *Berg v. Kelly*, 12-CV-3391, (TPG) (S.D.N.Y.) (NYPD officers detain approximately 100 "Occupy Wall Street" ("OWS") demonstrators for two hours against their will on November 30, 2011 inside a pen built of interlocking metal barricades and then release them without charges);

b. *Garcia v. Bloomberg*, 11-CV-6957 (JSR) (S.D.N.Y.) (NYPD arrest 700 "Occupy" demonstrators on the Brooklyn Bridge on October 1, 2011, for the simple act of walking on the bridge in what appeared to participants to be an action sanctioned by police present at the time);

c. *Huq. v. City of New York*, 14 CV 7081 (LTS) (S.D.N.Y.) (mother arrested without cause after leaving peaceful protest in Times Square);

d. *Treffs v. City of New York*, 12-CV-3030 (HB) (S.D.N.Y.) (legal observer arrested while observing Occupy Wall Street march on January 1, 2012, without probable cause and false complaint sworn out against him);

e. On September 20, 2011, an NYPD officer punched an OWS protester in the head, grabbed him by the neck and pulled him to the ground, without evident provocation. A journalist also reported the incident and provided a segment of the above video, stating that the video "shows an officer in a white shirt throwing a right-handed punch at a young man wearing a T-shirt and glasses."

f. *Lambert v. City of New York*, 153046-2011 (Sup. Ct., N.Y. Co.) (officers use excessive force against OWS protestor by affixing plastic handcuffs so tightly that it caused nerve damage, despite her repeated requests to the officers that the cuffs be loosened but were not);

g.  On September 24, 2011, a journalist stated he witnessed "about 20 or 30 police officers tackle [protesters] and prod them roughly with police batons."

h.  *Lotorto v. City of New York*, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

i.  On October 14, 2011, Video shows that an NYPD officer sprayed multiple OWS protesters with pepper spray. The video appears to show that the officer sprayed continuously for approximately eight seconds, pointing the spray at any protester who came near.

j.  Also on October 14, 2011, a journalist reported that an NYPD officer "grabbed a protester wearing a green shirt. Then the [officer] punched the man, knocking him to the ground."

k.  *Taylor-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issued four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

l.  *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);

m.  On November 15, 2011, a journalist reported an officer shoved a legal observer, also a retired judge, against a wall after she demanded the officer stop beating a protester.

n.  *Premo v. City of New York*, 13 CV 8141 (WHP) (S.D.N.Y.) (City agreed to pay $55,000 to settle case wherein plaintiff was arrested during a protest and charged with assaulting an officer; protester was acquitted of all charges at trial after video evidence demonstrated that arresting officer had lied under oath).

o.  *N.Y.C. Council Member Rodriguez v. Deputy Inspector Winski*, 2012 WL 1470305 (S.D.N.Y.) (12-CV-03389) (officers tackled City Council member Ydanis Rodriguez to the ground and struck him as the councilmemeber observed an Occupy Wall Street protest);

p.  *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);

q.  *Dunlop v. City of New York*, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

r.  *Kyne et al v. Wolfowitz et al*, 06-CV-02041 (S.D.N.Y.) (RJS) (protester arrested during the 2004 Republican National Convention; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

s. *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

t. *Kunstler v. City of New York*, 04-CV-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiffs' political beliefs);

u. *Kaufman v. City of New York*, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

v. *Carin v. City of New York*, 95-CV-3472 (JFK), 1998 U.S. Dist. LEXIS 1533 (S.D.N.Y.) (bystander arrested while observing the arrest of a street vendor in a public place);

w. On June 10, 2014, the CITY paid $538,000 to settle a lawsuit alleging officers unlawfully arrested 14 protesters in 2012. The protesters were held for several hours and released without charges.

114. Furthermore, upon information and belief, senior NYPD policymaking officials were aware of, ordered, observed, and/or acquiesced in the unconstitutional arrests of plaintiffs in response to the their First Amendment protected protest against an NYPD policy.

115. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), is the report of a panel led by Hon. J. Milton Mollen of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins.

b. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[1]

[…]

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[2]

c. In June of 2011, in the case in New York County Supreme Court entitled *People v. William Eiseman* (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

d. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[4] Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

---

[1]        Mollen Commission Report, p. 36.
[2]        Mollen Commission Report, pp. 40-41.
[3]         Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.
[4]        Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[5]

e. *People v. Alicea*, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant indicted for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly shows that the two arrestees had no contact);

f.  *People v. Arbeedy*, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

g. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[6]

---

[5]      *Id.*

[6]      John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

h. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[7] The officers were indicted for felony perjury, filing a false report and filing a false instrument.[8]

i. In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[9] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[10]

j. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[11]

k. *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on *Iqbal*/*Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some

---

[7]     Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[8]     John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/
    2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[9]     In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, *available at* http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_
    out_35g_to_granny_busted_as_hooker.html.

[10]     *Id.*

[11]     David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

l.  *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

m.  *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

n.  *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

o.  *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

p.  *Dotson v. City of New York*, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

q.  *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

r.  *Taylor v. City of New York*, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as *Richardson*, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified).

116.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, *inter alia*, by the following:

a.  In 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

b.  The Mollen Commission report states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-

corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[12]

c.  Upon information and belief, Defendant CITY did not take meaningful steps to eliminate the customs and practices exposed by the Mollen Commission Report.

d.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[13]

e.  *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

f.  *White-Ruiz v. City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

g.  *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

h.  *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 888 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her);

i.  *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and

---

[12]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.
[13]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

j. *Bryant v. City of New York*, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[14]

k. *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

l. *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

m. *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth); and

n. *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers").

117.    The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, then-Commissioner Raymond Kelly.

118.    The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in

---

[14]     For a description of this case and ultimate settlement, *see* Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors and commanders who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

119.    All of the foregoing acts by defendants deprived the plaintiffs of federally protected rights, including, but not limited to, the constitutional rights enumerated in paragraphs above.

120.    Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiffs of their rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

121.    Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

122.    Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

123.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to arrest plaintiffs without probable in blatant violations of plaintiffs' constitutional rights.

124.    Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiffs' rights.

125.    Plaintiffs' injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

126.    The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, implemented by agents or employees of the NYPD, of unlawfully

detaining, arresting, harassing, and/or using excessive force against persons engaged in First Amendment-protected expression.

127.    Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

WHEREFORE, plaintiffs respectfully request judgment against defendants as follows:

(A)    an order declaring that defendants' conduct violated plaintiffs' rights as guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution;

(B)    an order directing defendants to return all paper copies and destroy all electronic copies of (i) photographs taken of the plaintiffs, including originals, (ii) fingerprints, (iii) documents or notes containing answers to any questions; and (iv) any audio or visual recordings of plaintiffs;

(C)    an order awarding compensatory damages in an amount to be determined at trial;

(D)    an order awarding punitive damages against the individual defendants in an amount to be determined at trial;

(E)    an order awarding reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(F)    an order directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, costs, and disbursements of this action.

Dated:        October 21, 2014
              Brooklyn, New York

Respectfully submitted,

By: _____/s/_____
Rebecca Heinegg
Sarah Kunstler
Kunstler Law
*Attorneys for Plaintiffs*
42 Broadway, Suite 12-122
New York, NY 10004
(212) 227-2303

28