UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                         :
OLUGBENGA AKINNAGBE, et al.,                             :
                                                         :
                          Plaintiffs,                    :      **MEMORANDUM**
                                                         :      **<u>DECISION & ORDER</u>**
            - against -                                  :
                                                         :      14 Civ. 6147 (BMC)
The CITY of NEW YORK, et al.,                            :
                                                         :
                          Defendants.                    :
                                                         :
-------------------------------------------------------- X

**COGAN,** District Judge.

This case is before me on the parties' cross motions for partial summary judgment.

Plaintiffs brought this action alleging, among other things, false arrest and malicious prosecution

pursuant to 42 U.S.C. § 1983. The instant motions present a layered series of legal questions:

When may a police officer give an order dispersing a non-violent group of political

demonstrators, when they have gathered in front of a police station, without running afoul of the

First Amendment? Does it change the analysis if the police have made available a barricaded

area (a "designated demonstration area") a few feet away from the demonstrators' chosen

location, within sight and earshot of their intended audience? If so, what if the order to disperse

does not direct demonstrators into that area, but directs them to "leave this sidewalk" or be

arrested? Does it matter if the demonstrators were well aware that the barricaded area was

available? And finally, under what version of these circumstances would a dispersal order be so

clearly unlawful that no reasonable police officer could think otherwise?

The instant motions can be resolved by resort to the last question. For the reasons that

follow, plaintiffs' motion is denied, and defendants' motion is granted.

## BACKGROUND

The following facts are taken from the parties' submissions of proof in support of cross motions for summary judgment, including video recordings of the arrests at issue. Although there are a few facts in dispute that could be material in determining the existence of probable cause, there are none in dispute that would affect the determination of qualified immunity.

At approximately 5:00pm on November 1, 2011, a group of about 75 demonstrators, including plaintiffs, marched westward along the sidewalk on the south side of East New York Avenue toward the NYPD's 73rd Precinct stationhouse in East New York. They were escorted by NYPD community affairs officers. The demonstration, which had been advertised through fliers and online, was in protest of an NYPD policy commonly known as "stop and frisk."

The 73rd Precinct stationhouse is located on the south side of East New York Avenue, and is the only building on its block. There was a barricaded area formed by interlocking metal fences set up in the shape of a "U" on the sidewalk to the east of the stationhouse entrance, the direction from which the demonstrators arrived. The opening of the "U" faced away from the entrance.[1] The demonstrators marched past it, and plaintiffs concede that "several of the plaintiffs assumed or guessed that the barricaded area was available for their use." There was a six-foot wide walkway between the barricaded area and the wall of the stationhouse, leading to the entrance. That entrance is the only one available for use by the general public (although there is another entrance for police personnel). To the west of the entrance, *i.e.*, on the far side as the demonstrators approached, another set of barricades enclosed a construction area.

The open area of sidewalk between the two barricaded areas was directly in front of the precinct entrance. The demonstrators congregated there. A group of police officers was already

---

[1] Defendants and plaintiffs, respectively, characterize this area as a "Designated Demonstration Area" and a "U-shaped pen." I refer to it herein as "the barricaded area."

positioned between the demonstrators and the entrance. Once the demonstrators were assembled, there was space to walk on the sidewalk behind them, between them and the curb.

The parties dispute whether there was space to walk between the demonstrators and the barricaded area to the east of them. The video evidence depicts some individuals passing through that space. The parties also dispute whether there was space to walk between the demonstrators and the barricaded construction area to the west of them, although defendants concede that some police officers "walk[ed] single file" there at the relevant time (as the video evidence depicts).

The parties also dispute whether any person (including any police officer) was prevented from leaving or entering the stationhouse during the protest. It is undisputed that the demonstrators did not block vehicular traffic (or enter the street).

Shortly after the demonstrators gathered in front of the stationhouse entrance, plaintiff Carl Dix (who was leading the protest) announced that "[t]hat's why we didn't get into no pens, because we had to lock down the real criminal." The demonstrators repeated his words in a practice that plaintiffs call a "People's Microphone." At that time, other demonstrators had assembled in the barricaded area.

Defendant Captain William Gardner was present as the Commanding Officer of a task force specializing in "disorder control." Five to seven minutes after the demonstrators arrived, defendant Gardner gave the following order through a bullhorn:

> You are occupying these premises . . . you are also disrupting entrance and egress from this building the 73rd police precinct, a government building . . . . I am ordering you to leave this sidewalk. If you do so voluntarily, no charges will be

placed against you.  If you refuse to, you will be arrested and charged with obstruction of governmental administration.[2]

Defendants do not dispute that defendant Gardner did not expressly inform plaintiffs that they would be free to continue demonstrating if they moved into the barricaded area.  Various plaintiffs contend that they heard, did not hear, or do not recall if they heard defendant Gardner's order.  One or two minutes later, defendant Gardner issued another order:  "If you refuse to leave the sidewalk, you will be arrested for obstruction of governmental administration."[3]

The parties agree that two minutes and fifty seconds after the initial order, defendant Gardner ordered the arrest of plaintiffs, and that those arrests were carried out by the remaining individual defendant police officers.  It is not disputed that the "defendant officers knew Captain Gardner ordered the demonstrators to disperse."

## DISCUSSION

Summary judgment is appropriate if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).  The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation omitted).

The Court may consider video evidence in determining whether material questions of fact exist.  See Scott v. Harris, 550 U.S. 372, 379-80, 127 S. Ct. 1769 (2007); Fabrikant v. French,

---

[2] Defendants' Rule 56.1 statement sets forth a slightly different wording, including (among other differences) the phrase "unlawfully obstructing entrance and egress."  Plaintiffs' counter statement does not dispute defendants' version, and the differences are not material.

[3] Plaintiffs' Rule 56.1 statement contends that he said "*Since* you've refused to leave this sidewalk, I'm ordering your arrest on the charge of obstruction of governmental administration."  However, plaintiffs' counter statement does not dispute defendants' version.

691 F.3d 193, 215 n.6 (2d Cir. 2012) (affirming grant of summary judgment based on probable cause and qualified immunity in part relying on video evidence where plaintiff did not dispute accuracy of video, but "dispute[d] only how to characterize that evidence"); Heicklen v. Toala, No. 08-cv-2457, 2010 WL 565426, at *2 (S.D.N.Y. Feb. 18, 2010), aff'd sub nom. Heicklen v. Kelly, 409 F. App'x 457 (2d Cir. 2011) (granting summary judgment in part on the basis of facts "supported by incontrovertible video evidence"); see also Garcia v. Does, 779 F.3d 84 (2d Cir. 2015) (on motion to dismiss, considering facts revealed by video evidence that the parties agreed was incorporated into the complaint).

## I.

To recover for false arrest under § 1983, which derives the elements of that claim from New York law, a plaintiff must establish that: (1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. When probable cause exists, an arrest is privileged, and therefore probable cause is a complete defense to a claim for false arrest. See Weyant v. Okst, 101 F.3d 845 (2d Cir. 1996). Under both § 1983 and New York law, an officer "has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Garcia, 779 F.3d at 92 (quotation marks omitted).

In addition, "[a]n officer is entitled to qualified immunity against a suit for false arrest if he can establish that he had 'arguable probable cause' to arrest the plaintiff," which is the case "if either (a) it was objectively reasonable for the officer to believe that probable cause existed,

or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id.

The doctrine "provides a broad shield." Zalaski v. City of Hartford, 723 F.3d 382, 389 (2d Cir. 2013). It gives an arresting officer "breathing room to make reasonable but mistaken judgments" without fear of liability. Id. (quoting Messerschmidt v. Millender, ___U.S. ___, 132 S. Ct. 1235, 1244 (2012)). Qualified immunity is "a deliberately forgiving standard of review that provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id. (internal quotations and citation omitted).

Qualified immunity is available if an officer's conduct "does not violate clearly established constitutional rights of which a reasonable person would have been aware." Id. at 388 (citing Ashcroft v. al-Kidd, 563 U.S. 731, 131 S. Ct. 2074 (2011)). The "chronic difficulty" in applying this test

> is in accurately defining the right at issue. An overly narrow definition of the right can effectively insulate the government's actions by making it easy to assert that the narrowly defined right was not clearly established. On the other hand . . . if the right is defined too broadly, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

LaBounty v. Coughlin, 137 F.3d 68, 73-74 (2d Cir. 1998) (quoting Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034 (1987)) (internal quotation marks omitted); see also, e.g., Rivera v. Foley, No. 14-cv-00196, 2015 WL 1296258, at *11 (D. Conn. Mar. 23, 2015) (in granting qualified immunity, expressing skepticism of "a clearly established First Amendment right to assemble at the scene of an active police investigation and fly an unidentified object into a designated crime scene").

It is appropriate to address the "clearly established law" inquiry (*i.e.*, qualified immunity), without deciding whether there has actually been a constitutional violation "where

the [latter] turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct was not objectively unreasonable in light of existing law." Zalaski, 723 F.3d at 389 (internal quotation omitted).

Before proceeding to the substantive legal principles that govern probable cause and qualified immunity in this case, it is necessary to briefly consider the parties' positions in order to understand what is disputed, and what is not. Defendants move (and oppose plaintiffs' motion) on the grounds that they had probable cause to believe that plaintiffs were guilty of two violations of New York Penal Law: Disorderly Conduct under § 240.20(6), which provides *inter alia* that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse," N.Y. Penal Law § 240.20(6),[4] and Obstructing Government Administration under § 195.05, which a person violates when he "intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference . . . ." Id. § 195.05.

As relevant here, these criminal violations overlap to a large degree, because "[a]n officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with an order from a police officer." Marcavage v. City of New York, No. 05-cv-4949, 2010 WL 3910355, at *10 (S.D.N.Y. Sept. 29, 2010), aff'd, 689 F.3d 98 (2d Cir. 2012) (citing Johnson v. City of New York, No. 05-cv-7519, 2008 WL 4450270 (S.D.N.Y. Sept. 29, 2008), and Lennon v. Miller, 66 F.3d 416 (2d Cir. 1995)).

---

[4] Defendants expressly disclaim reliance on § 240.20(5), which makes it Disorderly Conduct to "obstruct[] vehicular or pedestrian traffic" (with the same *mens rea*).

However, an order must be lawful before failure to obey it gives rise to liability – under § 240.20(6) by its plain terms, and as courts have construed § 190.05. <u>See</u> <u>id.</u> (finding that "repeated refusal to follow *lawful* dispersal orders created probable cause to arrest Plaintiffs for obstruction of governmental administration . . ." (emphasis added)); <u>see</u> <u>also</u> <u>Dowling v. City of New York</u>, No. 11-cv-4954, 2013 WL 5502867, at *4 (E.D.N.Y. Sept. 30, 2013) ("Failing to obey a police order, in and of itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing government administration."); <u>Compare</u> <u>Lennon</u>, 66 F.3d at 424 ("Thus, it was reasonable in these circumstances for the officers to believe that they had the authority to order Mrs. Lennon to get out of the car. When she refused to leave the car, it was reasonable for them to construe her actions as 'interference' and to arrest her for violating [§ 195.05]."), <u>with</u> <u>Jackson v. City of New York</u>, 939 F. Supp. 2d 219, 230 (E.D.N.Y. 2013) ("Therefore, Plaintiffs failure to comply with an (unjustified) order to exit her vehicle cannot, without more, create the predicate probable cause to justify her arrest for obstruction of governmental administration.").[5]

The New York Court of Appeals has recently made clear that the intent element of § 240.20(6) is not to be overlooked, even where the First Amendment is not implicated. <u>See</u> <u>People v. Johnson</u>, 22 N.Y.3d 1162, 1164, 986 N.Y.S.2d 407 (2014) (finding "public harm element" not satisfied where criminal defendants were "partially blocking" store entrance but there was "no evidence that anyone trying to enter or leave the store was actually obstructed"). Similarly, a violation of § 195.05 requires an intent "to prevent the public servant from engaging in a specific official function." <u>Dowling</u>, 2013 WL 5502867, at *4 (internal quotation omitted). I see no reason to treat these intent requirements separately.

---

[5] That this requirement exists under both statutes makes perfect sense. To think otherwise would be to conclude that a police officer has the power to issue a citizen any order whatsoever, even an illegal one, and if the citizen does not follow it, the citizen can be arrested for obstruction of government administration.

The intent requirement, however, is met here. Plaintiffs concede (as the video evidence shows) that during the demonstration, they used the "People's Microphone" technique to "amplif[y] and disseminat[e]" to defendants, including defendant Gardner, plaintiff Dix's announcement they were there "to lock down the real criminal." This can only be interpreted as expresing an intent to prevent or impede ingress to and egress from the stationhouse. It would therefore have been reasonable for an officer to conclude from that statement that plaintiffs intended for their protest to interfere with its operation.

It is not disputed that an order to disperse was given, and that plaintiffs did not disperse. (It is of no moment that plaintiffs may not all have heard the order, because what is material is whether it was reasonable for the arresting officer defendants to believe that they did.)

Defendants' only argument with respect to probable cause under § 195.05 is that plaintiffs were interfering with the government function of "enforcing the . . . restriction on plaintiffs' ability to protest in front of the entranceway to the Stationhouse when [defendant Gardner] ordered the plaintiffs to disperse." This theory of the case does not constrain my analysis of probable cause any more than what officers at the scene articulated, or indeed thought, at the time of the arrests. See Devenpeck v. Alford, 543 U.S. 146, 125 S. Ct. 588 (2004). However, defendants' expressly limited reliance on §§ 240.20(6) and 195.05 (based on plaintiffs' refusal to disperse) amounts, in effect, to a concession that plaintiffs were acting lawfully prior to the issuance of the dispersal order.

I note that, although defendants argue that plaintiffs' refusal to disperse "also created the risk of congestion and inconvenience to those having business at the Stationhouse," that contention is beside the point. The circumstances created by plaintiffs' refusal to disperse matter *only* to the extent that they may be evidence of whether defendants' order was lawful at the time

it was given.  See, e.g., Dowling, 2013 WL 5502867, at *4 (arrest pursuant to § 195.05 premised

on failure to obey an order is privileged "[w]hen failing to obey an order creates some other

hazard or interference").  But there can be circumstances that do not involve unlawful conduct

that still justify an order to disperse, even where First Amendment values are at stake.  Thus, the

only question that is material to the resolution of the instant motions is whether it was reasonable

for defendants to believe that defendant Gardner's order to disperse was lawfully given.

## II.

To understand the principles that must be applied to assess the lawfulness of defendant

Gardner's dispersal order, it is useful to note that the applicable case law has developed in at

least two related but distinct contexts.  The first is against the backdrop of anti-loitering statutes,

see, e.g., City of Chicago v. Morales, 527 U.S. 41, 53, 119 S. Ct. 1849 (1999) (recognizing

"freedom to loiter for innocent purposes" under the Due Process Clause), and the second arises

under the First Amendment, which places even further limits on the power of the government to

disperse citizens gathered in the exercise of political dissent.  See, e.g., Papineau v. Parmley, 465

F.3d 46 (2d Cir. 2006).

Both sides appear to argue that the applicable standard is the one relied on by the Second

Circuit in its unpublished decision in Crenshaw v. City of Mount Vernon, 372 F. App'x 202 (2d

Cir. 2010), which held that an order to disperse is lawful for purposes of § 240.20(6) as long as it

is not "purely arbitrary" or "not calculated in any way to promote the public order."  Id. at 206

(quoting People v. Galpern, 259 N.Y. 279, 181 N.E. 572, 574 (1932)) (internal quotation marks

omitted).[6]  Even if there were not First Amendment principles to consider, I am not persuaded

---

[6] The Court found that this standard was met because "the request [to leave the scene of a confrontation] was in
response to [the plaintiff]'s admitted attempts to prevent his niece from answering the officers' questions."  Id.; see
also Brown v. City of New York, No. 13-cv-1018, 2014 WL 2767232, at *6 (S.D.N.Y. June 18, 2014) (probable

that the rule stated in <u>Crenshaw</u> is the correct one.  In <u>United States v. Nelson</u>, 500 F. App'x 90 (2d Cir. 2012), a later panel of the Court was urged to adopt the same standard.  There, the defendant – it was a suppression case – had been arrested for failing to disperse while congregating with two companions, such that they were "indisputably blocking the only cleared pathway, forcing customers to walk on the snow and ice in order to enter [a] market and thus creating a safety risk."  <u>Id.</u> at 93.  The defendant had argued that the dispersal order did not "serve an important end" and was therefore not lawful, and that <u>Galpern</u>'s language was no longer a correct interpretation of the statute because it gave too much discretion to police officers in light of "multiple Supreme Court cases h[olding] that loitering laws are unconstitutional" on void-for-vagueness grounds.  <u>Id.</u>

The Court decided not to decide whether <u>Galpern</u> was still good law, because it found that the dispersal order did "serve[] an important end."  Although the Court would apparently have found the dispersal order lawful under either standard, I share the defendant's view (and, one might guess, the Court's suspicion) that <u>Galpern</u>'s "purely arbitrary" standard is too broad. <u>See</u>, <u>e.g.</u>, <u>Morales</u>, 527 U.S. at 53, 119 S. Ct. at 1857 ("freedom to loiter for innocent purposes"); <u>Kolender v. Lawson</u>, 461 U.S. 352, 358, 103 S. Ct. 1855 (1983) (loitering statute "implicates consideration of the constitutional right to freedom of movement").

However, I too am spared the obligation to decide whether "purely arbitrary" would be an appropriate standard if the only constitutional right at stake were the freedom to loiter, because the dispersal order in this case involves a political demonstration, and so it must be examined with the heightened scrutiny required by the First Amendment's protection of free expression.

---

cause found under § 240.20(6) as construed in <u>Crenshaw</u> because in light of "officers' prior knowledge that people had been banging on the doors refusing to leave, their instruction to plaintiff to go home was . . . not 'arbitrary'").

# III.

As discussed above, the only question that I must answer in order to resolve the instant motions is whether the circumstances of the demonstration were such that the order to disperse was lawful – or, to be more precise, whether it was reasonable or even arguably reasonable for the defendant officers to think that it was.[7]  There are two First Amendment lenses through which the facts of this case can be viewed in answering this question.

### A.     Time, Place & Manner Restrictions

Defendants argue that defendant Gardner's order to disperse could reasonably have been understood to have been a permissible "time, place, and manner" restriction that left open an adequate alternative in the form of the barricaded area to the east of the demonstration.  Such restrictions are permissible if they "(1) are justified without reference to the content of the regulated speech, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information."  Marcavage v. City of New York, 689 F.3d 98, 104 (2d Cir. 2012) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746 (1989) (internal quotation marks omitted and parentheses added).

This doctrine is more typically invoked in the context of an *ex ante* restriction.  See, e.g., id. at 101 (assessing reasonableness of the NYPD's "three-zone system" for pedestrian control at the 2004 Republican National Convention, that included "a demonstration area, a frozen area (with no pedestrian traffic), and a no-demonstration area").  Nevertheless, the Second Circuit has recognized that a spontaneous police order to demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine.  In Zalaski, demonstrators at a foot race for children

---

[7] I need not distinguish between or among defendant Gardner and the other individual defendants for purposes of this inquiry.  "[P]olice officers are shielded from liability if they reasonably rely on a superior officer's plausible orders, which viewed under all the circumstances, could lead an officer to conclude that probable cause exists."  Heicklen, 2010 WL 565426, at *5 (citing Anthony v. City of New York, 339 F.3d 129, 138 (2d Cir. 2003)).  Liability for all of them rises or falls with the objective reasonableness of their perception that defendant Gardner's order was lawful.

were arrested for obstructing pedestrian traffic after refusing to follow an order to move from the finish area to a nearby location where other demonstrators had already gathered. The Court affirmed the District Court's determination that the police officer defendant "did not violate plaintiffs' First Amendment rights by directing them to move from the patio steps to the grassy knoll because, although plaintiffs' protest raised a matter of public concern and Riverfront Plaza qualified as a public forum, [the defendant officer]'s direction was content-neutral and a reasonable time, place, and manner restriction." Zalaski, 723 F.3d at 388 (citing 838 F. Supp. 2d 13 (D. Conn. 2012)). Relying, as here, on video evidence, the Court in Zalaski held that under the circumstances, "a reasonable officer could have concluded that the only thing plaintiffs would lose by moving . . . was the ability to hinder the movement of children and other race attendees as they traveled from the walkway to the patio platform." Id. at 394.[8]

As to the first requirement, although plaintiffs invite me to speculate otherwise, there is not a shred of evidence in the summary judgment record that defendant Gardner issued the order to disperse because of the content of plaintiffs' speech. As to the second requirement, "[a]s a general matter, it is clear that a State's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective." Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 650, 101 S. Ct. 2559 (1981) (internal quotation omitted). The state has a "strong interest in . . . promoting the free flow of traffic on public streets and sidewalks . . . ." Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 768, 114 S. Ct. 2516 (1994). "The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the

---

[8] The arrest at issue in Zalaski was not for failure to obey a dispersal order, but the First Amendment was implicated by a requirement that a violation of the Disorderly Conduct provision at issue be supported by a showing that the arrestee plaintiffs' "predominant intent was to cause inconvenience, annoyance or alarm, rather than to exercise their constitutional rights to free speech." Id. at 390-91 (internal quotations omitted), 392 n.7.

regulation, and the means chosen are not substantially broader than necessary to achieve that interest." Ward, 491 U.S. at 782-83, 109 S. Ct. 2746 (1989). It is clear that these requirements were met here.

The more difficult issue in this case is whether adequate alternative channels were available. If it were undisputed that defendant Gardner had merely directed plaintiffs from their location in front of the stationhouse entrance to the barricaded area, this would be an easier case. I do not see how it could seriously be contended – and in fact plaintiffs do not seem to contend – that the barricaded area, if indeed it was made available to plaintiffs, was not an adequate alternative to their chosen location a few feet away. See Marcavage, 689 F.3d at 108 ("demonstration zone" outside of the 2004 Republican National Convention was an adequate alternative channel of communication even though it was not "not within sight and sound" of the demonstrators' intended audience (internal quotation omitted)).

However, defendant Gardner's orders were not clearly orders to move from in front of the stationhouse to the barricaded area. His instructions to the demonstrators, clearly audible on the video, were to "leave this sidewalk." I must therefore determine whether a reasonable officer could have believed that a reasonable demonstrator would have understand the order that way, in light of the available evidence of the circumstances of the demonstration. See Garcia, 779 F.3d at 92-93 (qualified immunity is available when "it cannot be said that . . . a reasonable officer would necessarily have understood that the demonstrators would reasonably interpret" the circumstances as plaintiffs contended that they would).

In Garcia, which also presented the Court with video evidence, the Second Circuit took an extremely broad view of qualified immunity in a setting where – as here – probable cause turned on what a reasonable police officer *would* have understood about what a reasonable

demonstrator, in turn, *should* have been able to understand about his rights.  Specifically, it was undisputed in Garcia that the defendant officers had reason to believe that the plaintiffs' conduct was a *prima facie* violation of New York Penal Law § 240.20(5) (obstructing pedestrian traffic), because at the time of the arrests, the plaintiffs were congregated in a roadway.  Garcia, 779 F.3d at 92-93.  The plaintiffs argued, however, that probable cause was vitiated by conduct on the part of the police that could have been perceived as implied permission to be there.  Id. at 93.

The Court emphasized that the relevant inquiry was not whether plaintiffs' legal theory (of implied permission) was the correct one on the facts viewed in hindsight, but whether that theory "was so clearly established as a matter of law, and whether the facts establishing that [theory] were so clearly apparent to the officers on the scene as a matter of fact, that any reasonable officer would have appreciated that there was no legal basis for arresting plaintiffs."  Id. at 93.  "The essential flaw in plaintiffs' logic," the Court further explained,

> is the extent to which it requires police officers to engage in an essentially speculative inquiry into the potential state of mind of (at least some of) the demonstrators.  Neither the law of probable cause nor the law of qualified immunity requires such speculation.  Whether or not a suspect ultimately turns out to have a defense, or even whether a reasonable officer might have some idea that such a defense could exist, is not the question.  An officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful.

Id. at 96 (citation omitted).

Here, there is ample evidence suggesting that defendants are protected by qualified immunity.  First and foremost, plaintiffs marched directly past the barricaded area on their way to their chosen location in front of the stationhouse entrance.  On the video, plaintiff Carl Dix, the leader of the demonstration, can be heard stating that "[t]hat's why we didn't get into no pens," a pronouncement that was repeated by the "People's Microphone."  In my assessment,

that statement could reasonably have suggested to the officers at the scene that the demonstrators were aware that the barricaded area had been available to them, at least at the outset.

Even at the time of the arrests, it could reasonably have suggested to an officer that the protestors should have understood defendant Gardner's reference to "this sidewalk" to mean, specifically, the area in front of the precinct where they had gathered. It is hard to imagine that a reasonable officer presented with the scene depicted in the video would have thought that plaintiffs were not aware that the barricaded area was still available to them. In fact, although plaintiffs' subjective beliefs are not dispositive, it is telling that some of them have since testified that they were.

The only way to support a finding that there was no "alternative channel" on the facts of this case from the perspective of a reasonable officer is to focus myopically on the language that defendant Gardner used in his dispersal order, and to come to the conclusion that his order could *only* have been reasonably understood to mean one thing – that plaintiffs were to disperse completely and end their demonstration. I do not see how a reasonable jury could so interpret that statement. Even taken at its most literal, an order to leave "this sidewalk" leaves open the possibility of simply moving the demonstration across the street.

In addition, critically, to actually consider defendant Gardner's words in context is to realize that before saying "leave this sidewalk," he announced to the demonstrators that they were "disrupting entrance and egress from . . . the 73rd police precinct, a government building," which could reasonably have been understood to have been the purpose of the dispersal order.

In short, viewing the video evidence, it simply cannot be called unreasonable, let alone incompetent or a knowing violation of law, to have believed that a demonstrator in those circumstances would in turn have understood that if he moved to the barricaded area when the

order was given, he would not have been arrested.  That does not mean every plaintiff necessarily understood that, although it is likely that some or all of them did.  But to say that a reasonable officer could not have heard the order in context, and have believed that the demonstrators would have understood it to mean that that all that was being ordered was to clear the front entrance of the stationhouse, would be to fail to give the officer the "breathing room" that the doctrine of qualified immunity requires.

### B.    Clear and Present Danger

As discussed in the previous section, plaintiffs argue that defendant Gardner's order was not a permissible time, place, and manner restriction – in other words, that it must be thought of as an unconditional end to the demonstration.  However, even if they are correct, defendants are entitled to qualified immunity because their right to be free from an unconditional order of dispersal under the circumstances of this case was not "clearly established."

As plaintiffs understandably emphasize, it is true that the Second Circuit has articulated the law governing dispersal of protests in terms that suggest a very high bar for police officers arguing that they have probable cause to break up a political demonstration.  "In the protest context, the Supreme Court has already well articulated the contours of the [free speech] right and made clear that the police may not interfere with demonstrations unless there is a 'clear and present danger' of riot, imminent violence, interference with traffic or other immediate threat to public safety."  Papineau, 465 F.3d at 57 (citing Cantwell v. Connecticut, 310 U.S. 296, 308-09, 60 S. Ct. 900 (1940)).  In Papineau, then-Circuit Judge Sotomayor explained further that "[n]either energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest."  Id. at 58 (citing Cox v. State of La., 379 U.S. 536, 546-47, 549 n.12, 85 S. Ct. 453 (1965) ("Cox I")).  In addition, "the [Supreme] Court has repeatedly held that police may not

interfere with orderly, nonviolent protests merely because . . . they simply fear *possible* disorder." Id. at 56 (citing Cox I, 379 U.S. at 550, 85 S. Ct. 453) (emphasis added).

However, Papineau does not clearly establish plaintiffs' rights here. First, the facts of Papineau are very different from those before me. In that case, demonstrators had gathered on private property abutting a public highway. Local police interacted with the demonstration and allowed it to continue for 10 days. At some point, state police became involved. In connection with a "media event," a group of protestors entered the highway to distribute literature. Thereafter, and partly in response, about 70 state troopers entered the demonstrators' private property in a "skirmish line" and then "charged into the demonstration and began arresting protesters allegedly indiscriminately." Id. at 53. In light of these obvious factual distinctions, Papineau does not clearly establish anything about a demonstrator's right to be free from arrest in the circumstances of this case. See LaBounty, 137 F.3d at 73-74.

Second, the extent to which Papineau "clearly established" a rule applicable here is further undermined by the Court's alternative holding that the arrests in that case would have been improper "even if the [police] had a lawful basis to interfere with the demonstration" because they were made without advance warning. Papineau, 465 F.3d at 60. For one thing, this arguably means that the Court's adoption of the "clear and present danger" standard was dicta. Moreover, the Court noted the absence of an order to disperse, and observed that "[i]n some cases . . . even an order to disperse would not divest demonstrators of their right to protest." Id. at 61 n.6 (citing Cox v. State of La., 379 U.S. 559, 85 S. Ct. 476 (1965) ("Cox II")).

This observation suggests that the Court's rule concerning when police may "stop[] or interrupt[]" a public protest does not apply with equal force to a verbal order to disperse it, even at pain of arrest. That, in turn, leaves us with no guidance on when such an order might be

permissible. The Court appears to simply be telling us that a dispersal order might be lawful and it might not, and refers us back forty years (now fifty) to Cox II for guidance on which circumstance this is. Other than the Second Circuit's focus on the revoked grant of permission in Cox II, not present here, that is of scant assistance. The language of footnote six in Papineau does not *necessarily* mean that the high standards articulated by the case do not apply to a dispersal order, *i.e.*, that they apply only to an arrest. But it certainly casts doubt on the applicability of that case to the instant facts.

Finally, Papineau gives plaintiffs no support if their demonstration caused sufficient "interference with traffic or other immediate threat to public safety," Papineau, 465 F.3d at 57, in the eyes of a reasonable officer. That is important, because the crux of defendants' justification for the dispersal order in this case is the obstruction of pedestrian traffic into and out of the only public entrance to a working Precinct stationhouse. The question becomes how much obstruction of pedestrian traffic justifies an order to disperse.

In a case that bears important similarities to this one, but that did not cite Papineau, the court in Heicklen v. Toala, 2010 WL 565426, at *4, found probable cause for a violation of § 240.20(6) – *i.e.*, a lawful order – where demonstrators were "obstructing pedestrian traffic" and were ordered to "leave the area" or be arrested.[9]

In Heicklen, demonstrators had gathered on a stairway that was the only means of pedestrian access from a public plaza near the United Nations headquarters in Manhattan to the sidewalk above. The demonstrators "blocked" pedestrian traffic on the stairs and walkway. Id.

[9] Although a District Court holding cannot define a right as "clearly established" for purposes of qualified immunity, a District Court's rejection of a right of action under given circumstances certainly suggests that there is no clearly established right being violated. See Richardson v. Selsky, 5 F.3d 616, 623 (2d Cir. 1993) ("If the district judges in the Southern District of New York, who are charged with ascertaining and applying the law, could not determine the state of the law with reasonable certainty, it seems unwarranted to hold prison officials to a standard that was not even clear to the judges.").

at *2.  A police officer using a loudspeaker "ordered the group to leave the area and warned those who refused that they would be arrested."  Id.  When they did not disperse, the demonstrators (including the plaintiff) were arrested.  The court found that there was probable cause under such circumstances, holding specifically that "[t]he authority to issue dispersal orders continues to play a commonplace and crucial role in police operations, particularly in urban areas."  Id. (quoting Morales, 527 U .S. at 108–09, 119 S. Ct. 1884).  The court also found that the order was a "reasonable, appropriate, and limited means of maintaining order and the free movement of pedestrian traffic."  Id. at *4.  But, importantly, the court did not find that there was an "alternative channel" in order to support this result.

That decision, and the unpublished decision of the Second Circuit affirming it,[10] can be read for the proposition that, despite any suggestion to the contrary in Papineau, complete or effectively complete obstruction of pedestrian traffic is a valid reason to disperse a group of demonstrators from "the area" without expressly affording them an alternative.  In other words, it cannot be said that the right to be free of arrest while demonstrating in a manner that effectively blocks pedestrian traffic is a clearly established right simply based on language – which is arguably dicta – in Papineau.

In this case, the parties dispute, as a factual matter, whether public ingress and egress from the precinct was cut off by the demonstration.  The video evidence and testimony in the summary judgment record, which I have reviewed carefully, does not unequivocally favor either characterization.  It is true that individuals can be seen coming and going along the edges of the demonstration and that there is no evidence of any particular person being denied ingress or egress, but the video by no means depicts a situation in which public access was unimpeded.  It

---

[10] Judge Koeltl's decision in Heicklen was affirmed "for substantially the same reasons stated by the district court in its thorough and well-reasoned decision."  409 F. App'x at 458.

is true that there was a pathway behind the barricaded area, as plaintiffs emphasize, but it is by no means clear that it would have been visible to a member of the community approaching the entrance from the opposite direction on innocent business. Given the circumstances as a whole, as they are depicted on the video, it cannot be said with a straight face that a reasonable member of the community would not have considered the stationhouse inaccessible.

One of very few things that *can* be said with any certainty on the basis of the video is that an officer confronted with the situation depicted on it could have *reasonably* concluded that the public was effectively being denied access to the Precinct stationhouse by the demonstration. In other words, that conclusion might have been wrong, but in no way could it be found unreasonable. That in turn is enough to support a determination, as a matter of law, that no clearly established constitutional right was violated, and that defendants are entitled to qualified immunity.

As a final note, I am cognizant of the fact that I am not the first judge to assess the video evidence in this case and to make a determination as to whether the order to disperse was lawful, *i.e.*, whether plaintiffs were in violation of § 240.20(6) when they did not disperse in compliance with defendant Gardner's order. As one criminal court said of the incident,

> a video recording was presented at trial which showed that the defendants were peacefully assembled and did not attempt to prevent anyone from ingress and egress. If there was no justifiable reason for the protesters to move then it cannot be said that the police's order to disperse was lawful.

People v. Diaz, 39 Misc. 3d 1237(A), 972 N.Y.S.2d 145 (N.Y.C. Crim. Ct. 2013). But that answers an importantly different question, because the issue before me is not whether the order was lawful in light of facts proven beyond a reasonable doubt so as to expose the defendant in that case (plaintiff here) to criminal liability, but whether it was so unreasonable for the police officers on the scene to have concluded otherwise that they should be held financially

accountable for making the arrests. Having viewed the video, I can say without hesitation as a matter of law that the <u>Diaz</u> court's view of the circumstances was a reasonable one. But I can say with equal certainty that it was not the only reasonable one.

## IV.

A malicious prosecution claim under § 1983 (which also borrows its elements from New York law) requires proof that "(1) the defendant commenced a criminal proceeding against him; (2) the proceeding ended in the plaintiff's favor; (3) the defendant did not have probable cause to believe the plaintiff was guilty of the crime charged; and (4) the defendant acted with actual malice." <u>Cook v. Sheldon</u>, 41 F.3d 73, 79 (2d Cir. 1994).

Probable cause to arrest and for malicious prosecution are distinct inquiries. <u>See</u> <u>Posr v. Court Officer Shield No. 207</u>, 180 F.3d 409 (2d Cir. 1999). Nevertheless, as a general matter, "a malicious prosecution claim will be defeated by a finding of probable cause to arrest, unless the plaintiff can demonstrate mitigating facts to vitiate probable cause which were first uncovered after the arrest." <u>Carson v. Lewis</u>, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999) (citing <u>Dukes v. City of New York</u>, 879 F. Supp. 335, 342 (S.D.N.Y. 1995)). The "arguable probable cause" standard applies equally to claims for malicious prosecution as well as to claims for false arrest. <u>See</u> <u>Betts v. Shearman</u>, 751 F.3d 78 (2d Cir. 2014).

There is no contention in this case that new facts were brought to light following plaintiffs' arrest and before the initiation of prosecution. Plaintiffs argue, however, that accusatory instruments sworn to by defendants contained false statements that plaintiffs were "blocking" the entrance to the stationhouse and continued to do so after they were ordered to disperse. As a general matter, plaintiffs are correct that false information conveyed by police to prosecutors can support a claim for malicious prosecution. <u>Cf</u>, <u>e.g.</u>, <u>Brome v. City of New York</u>,

No. 02-cv-7184, 2004 WL 502645, at *6 (S.D.N.Y. Mar. 15, 2004) (denying the defendant's

motion for summary judgment on malicious prosecution claim in part because "a question of fact

exists as to [defendant]'s account of the events leading up to plaintiff's arrest" and therefore the

plaintiff "created a triable issue of fact to rebut both the presumption of an independent

prosecutorial decision and the presumption of probable cause arising from the indictment")

(citing Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997)).

     However, when, as here, the accuracy of a statement made by an arresting officer to

prosecutors is in dispute, it is appropriate to consider the officer's conduct in making the

statement through the lens of qualified immunity.  "It is firmly established that a constitutional

right exists not to be deprived of liberty on the basis of false evidence fabricated by a

government officer.  The question is therefore whether it was objectively reasonable for [the

defendant officer] to believe that he did not violate that right."  Maldonado v. City of New York,

No. 11-cv-3514, 2014 WL 787814, at *10 (S.D.N.Y. Feb. 26, 2014) (citation and internal

quotation marks omitted); see also Dowling, 2013 WL 5502867, at *9 ("It would be reasonable

for [the defendant police officer] to describe events as he perceived them, even if his perception

was erroneous.").

     First and foremost, the operative factual statement contained in the accusatory

instruments is that plaintiffs were arrested because they "refused to disperse" when ordered to do

so.  If anything, as discussed in the preceding sections, the statement that plaintiffs were blocking

the stationhouse entrance would have served to provide prosecutors a basis – but only one of

many that exist in this case – to conclude that the order to disperse was a lawful one.  But even if

these statements are properly viewed as material, having reviewed the video evidence, I cannot

say that it was so objectively unreasonable for defendants to describe the circumstances as they

did as to mean they were "plainly incompetent" or "knowingly violate[d] the law." <u>Zalaski</u>, 723 F.3d at 389.

## CONCLUSION

For the foregoing reasons, defendants are entitled to qualified immunity with respect to plaintiffs' claims of false arrest and malicious prosecution pursuant to 42 U.S.C. § 1983. Plaintiffs' [38] motion for summary judgment is denied, and defendants' [42] motion for summary judgment is granted.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
September 1, 2015